**MYLES P. McALINEY, ESQ.**

Crown Medical Collections

100 West High Street

Ebensburg, PA 15931 Tel:

(570) 237-5237

mpmcalineylaw@gmail.com

Special Counsel to Debtor,

Bridge Diagnostics, LLC

(Admitted Pro Hac Vice)

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA — SANTA ANA DIVISION**

| | |
|---|---|
| In re: | Case No.: 8:24-bk-10803-SC |
| **BRIDGE DIAGNOSTICS, LLC,** | Chapter 11<br>Subchapter V Case [FRBP 1020] |
| Reorganized Debtor. | **MOTION OF REORGANIZED DEBTOR, BY AND THROUGH SPECIAL COUNSEL CROWN MEDICAL COLLECTIONS, TO EXTEND DEADLINE TO COMMENCE AVOIDANCE ACTIONS UNDER 11 U.S.C. §§ 544, 545, 547, 548, AND 553** |
| | <u>Hearing Date</u><br>Date: May 6th, 2026<br>Time: 1:30PM<br>Location: Courtroom 5C<br>411 West Fourth Street<br>Santa Ana, CA 92701 |

TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE

UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:

**SUMMARY OF ARGUMENT**

Under 11 U.S.C. § 546(a), an action or proceeding arising under 11 U.S.C. §§ 544, 545, 547, 548 and 553 may not be commenced after two years after the entry of the order for relief.

Bridge Diagnostics, LLC (the "Debtor") filed a voluntary petition under Subchapter V of Title 11 of the United States Code on March 29, 2024. The current deadline to file avoidance actions under 11 U.S.C. §§ 544, 545, 547, 548 or 553 is March 29, 2026 (the "Deadline").

Since confirmation of the Debtor's Chapter 11 Plan of Reorganization (the "Plan"), the Debtor and its court-approved professionals, including Crown Medical Collections ("CMC") as Special Counsel, have conducted a comprehensive, data-driven investigation into the Debtor's accounts receivable, payment histories, and creditor relationships. This investigation has already identified millions of dollars in potential underpayments, improper denials, and systemic adjudication irregularities across multiple national payers including at least one entity that has filed a proof of claim against this estate while the Debtor's own analysis indicates that same entity may owe substantial funds to the Debtor.

This Motion is necessary to preserve valuable estate causes of action that are actively being investigated but cannot yet be fully evaluated due to the extraordinary volume and complexity of the transactions at issue, the multilayered structure of the Debtor's receivables portfolio across commercial and government payers, and the refusal of certain major counterparties to engage in good-faith reconciliation efforts.

The Reorganized Debtor respectfully requests that the Court extend the Deadline for approximately six months, through and including September 25, 2026.

- 2 -

**I.      BACKGROUND**

**A.   The Bankruptcy Filing, Plan Confirmation, and Deadline**

On March 29, 2024 (the "Petition Date"), the Debtor filed a voluntary petition under Subchapter V of Chapter 11 of Title 11 of the United States Code. The Debtor is a healthcare diagnostic testing company that operated COVID-19 diagnostic testing services, submitting claims to hundreds of commercial and government payers under applicable Medicare, Medicaid, and private insurance coverage programs.

On September 13, 2024, the Court confirmed the Plan. The Debtor continues to administer the estate and reconcile creditor claims in accordance with the confirmed Plan.

Under 11 U.S.C. § 546(a)(1)(A), the current deadline to commence avoidance actions under §§ 544, 545, 547, 548, and 553 is March 29, 2026.

**B.   The Debtor's Ongoing Investigation**

The Debtor, together with CMC as Special Counsel, has conducted a comprehensive audit and reconciliation of accounts receivable, creditor claims, and payment histories spanning multiple years of operations and hundreds of thousands of individual claims. See Declaration of Richard Hersperger ("Hersperger Decl."), ¶5. This investigation has included detailed analysis of:

- Electronic claim submission data (ANSI X12 837 transactions);
- Payer remittance advice (ANSI X12 835 Electronic Remittance Advice transactions);
- Real-time claim status inquiry and response data (ANSI X12 276/277 transactions);
- Eligibility and benefits verification data (ANSI X12 270/271 transactions);
- Internal payment reconciliation and accounts receivable ledgers; and
- Payer-specific reimbursement histories and fee schedule applications.

The investigation has encompassed tens of thousands of claims submitted across multiple commercial, Medicare, and Medicaid payers, representing tens of millions of dollars in billed charges. Hersperger Decl., ¶6. Based on this analysis, CMC has identified millions of dollars in potential underpayments, improper denials, and other discrepancies requiring further investigation. Id., ¶8. The investigation has revealed multiple categories of issues, including: (i) systemic underpayment or denial of laboratory and diagnostic claims; (ii) application of reimbursement methodologies inconsistent with applicable fee schedules and payer contracts; (iii) blanket denial of claims without individualized adjudication; and (iv) claims that remain unpaid or unresolved. Id.

**C.   Specific Findings to Date**

The Debtor's investigation to date has identified significant outstanding balances and discrepancies involving the following major payers, among others:

- Blue Cross Blue Shield (Illinois) – approximately 71,000 claims reviewed, with over $6.5 million identified as outstanding or underpaid;
- United Healthcare – approximately 32,000 claims reviewed, with over $2.5 million identified as outstanding or underpaid; and
- Aetna – approximately 26,000 claims reviewed, with over $2.2 million identified as outstanding or underpaid.

See Hersperger Decl., ¶10. In addition to the foregoing, the Debtor's investigation has identified material discrepancies across numerous other payers, including Medicare programs, national commercial carriers, and managed care organizations, many of which reflect similar patterns of underpayment, denial, or inconsistent reimbursement methodology application. Id., ¶11.

Significantly, United Healthcare has filed a proof of claim in this case. Hersperger Decl., ¶12. The Debtor's ongoing analysis indicates that United Healthcare may in fact owe substantial sums to the

- 4 -

Debtor arising from unpaid or underpaid claims creating a potential basis for setoff, recoupment, or affirmative recovery by the estate. Id. The Debtor cannot fully evaluate this relationship without completing its investigation and, if necessary, formal discovery. Id.

The Debtor's investigation has also identified a particularly acute pattern of underpayment and denial across multiple Molina Healthcare entities operating in multiple jurisdictions. Hersperger Decl., ¶13. The Debtor submitted thousands of claims to Molina-affiliated entities across multiple states, and the Debtor's analysis reflects consistently low reimbursement rates that are not adequately explained by applicable fee schedules or coverage determinations. Id. In several instances, Molina entities reimbursed only a small fraction of billed amounts in certain jurisdictions less than fifteen percent (15%) and, in some instances, less than five percent (5%) of billed charges. Id.

Despite repeated efforts by the Debtor and its professionals to engage Molina Healthcare in reconciliation discussions, Molina has declined to participate in any meaningful meet-and-confer process, instead imposing preconditions that have functioned as a barrier to resolution. Hersperger Decl., ¶14. This bad-faith refusal to engage has directly contributed to the need for formal discovery and the requested extension of the § 546(a) deadline. Id.

### D.  Pending and Active Discovery

CMC's investigation is active and ongoing. Hersperger Decl., ¶15. Additional time is required due to: (i) the volume of claims at issue, spanning hundreds of payers and hundreds of thousands of individual claims; (ii) the complexity of the reimbursement frameworks, payer contracts, and applicable fee schedules for each counterparty; (iii) the absence of claims processing documentation and adjudication data that only formal discovery can compel; and (iv) the refusal of Molina and other counterparties to engage in good-faith reconciliation. Id.

In many instances, counterparties have not produced sufficient information to permit complete reconciliation. Hersperger Decl., ¶16. CMC has been unable to obtain claims processing records, adjudication system documentation, or reimbursement algorithm data from multiple payers despite informal requests. Id. Formal discovery under Federal Rule of Bankruptcy Procedure 2004 is necessary to compel production of this information. Id.

CMC is actively preparing Rule 2004 examination requests directed to specific payers and counterparties, including entities that have filed proofs of claim in this case and entities whose adjudication practices reflect the patterns described above. Hersperger Decl., ¶17. Issuing subpoenas, litigating any objections, receiving productions, and completing the necessary analysis cannot be accomplished before the current Deadline of March 29, 2026. Id.

## II.  LEGAL ARGUMENT

Under 11 U.S.C. § 546(a)(1), a debtor-in-possession must commence avoidance actions arising under 11 U.S.C. §§ 544, 545, 547, 548 and 553 within two years after the entry of the order for relief. The Ninth Circuit has held that 11 U.S.C. § 546(a) is not a jurisdictional bar, but a statute of limitations, which may be extended. *In re Petty*, 93 B.R. 208 (B.A.P. 9th Cir. 1988). "Every court that has considered the issue has held that equitable tolling applies to § 546(a)(1)." *Ernst & Young v. Matsumoto (In re United Ins. Mgmt.)*, 14 F.3d 1380, 1384 (9th Cir. 1994).

Moreover, a "court should not look at the trustee's post-discovery diligence when considering whether equitable tolling should be applied." *Templeton v. Milby (In re Milby)*, 545 B.R. 613, 622 (B.A.P. 9th Cir. 2016). The limitations period may also be extended by court order or stipulation. *Official Creditors' Comm. for Qmect, Inc. v. Electrochem Funds, LLC (In re Qmect, Inc.)*, 349 B.R.

620, 624-25 (Bankr. N.D. Cal. 2006) (§ 546's legislative history indicates that the time limits of § 546(a) "are not intended to be jurisdictional and can be extended by stipulation between the necessary parties to the action or proceeding"). When an extension of time is sought before the § 546(a) period expires, the request is governed by the "for cause" analysis under Rule 9006(b). *See, e.g., In re Fundamental Long Term Care, Inc.*, 501 B.R. 784, 788 (Bankr. M.D. Fla. 2013); *accord  In re The Litigation Practice Group P.C.*, Case No. 8:23-bk-10571-SC, ECF No. 2382 (Bankr. C.D. Cal. Apr. 9, 2025) (Order Granting Trustee's Motion for Order Extending the Estate's Time to File Actions Governed by 11 U.S.C. §§ 108, 546(a), and 549(d), extending the Chapter 11 trustee's § 546(a) deadline for "good cause appearing").

Here, there is ample cause to extend the Deadline. The Debtor's investigation is active and ongoing and cannot be completed before March 29, 2026. Hersperger Decl., ¶15. The investigation encompasses hundreds of payers, hundreds of thousands of individual transactions, and complex reimbursement frameworks that vary by counterparty and require individualized analysis. That analysis cannot be rushed without risking errors or permanently forfeiting viable estate claims. Furthermore, key information, including claims processing records and adjudication algorithm data is in the hands of third parties and can only be obtained through formal Rule 2004 discovery that cannot be completed before the current Deadline.

Finally, certain counterparties, including Molina Healthcare, have declined to engage in good-faith reconciliation efforts, imposing preconditions that have functioned as barriers to resolution and further slowed the process. In summary, the Debtor has made diligent, good-faith progress in its investigation, but the volume and complexity of the issues and the necessity of third-party discovery make the current Deadline impractical. Extending the Deadline will allow the Debtor to complete its investigation and, if appropriate, bring well-supported claims on behalf of the estate.

**III. CONCLUSION**

For the foregoing reasons, the Reorganized Debtor respectfully requests that this Court enter an

Order:

1. Granting this Motion;

2. Extending the deadline to commence avoidance actions under 11 U.S.C. §§ 544, 545, 547,

   548, and 553 from March 29, 2026, through and including September 25, 2026; and

3. Granting such other and further relief as the Court deems just and appropriate.


Dated: March 27, 2026


Respectfully submitted,

CROWN MEDICAL COLLECTIONS


By: /s/ Myles P. McAliney

Myles P. McAliney, Esq.

Special Counsel to Debtor Bridge Diagnostics, LLC

(Admitted Pro Hac Vice)

**DECLARATION OF RICHARD HERSPERGER IN SUPPORT OF**

**MOTION TO EXTEND DEADLINE TO COMMENCE AVOIDANCE ACTIONS**

**UNDER 11 U.S.C. §§ 544, 545, 547, 548, AND 553**

I, Richard Hersperger, declare as follows:

**I. QUALIFICATIONS AND BASIS FOR TESTIMONY**

1. I am the Chief Executive Officer of Crown Medical Collections ("CMC"), a healthcare collections law firm specializing in the recovery of unpaid and underpaid medical claims on behalf of healthcare providers, including diagnostic testing laboratories. CMC administers approximately $3 billion in outstanding healthcare receivables and serves as special counsel in multiple active Chapter 11 bankruptcy proceedings.

2. CMC has been retained and approved by this Court as Special Counsel to Bridge Diagnostics, LLC (the "Debtor") to investigate and pursue recovery of the Debtor's accounts receivable from healthcare payers, including the identification and pursuit of potential causes of action arising from underpayment, denial, or improper adjudication of the Debtor's claims.

3. I have personal knowledge of the matters set forth in this Declaration based on my direct supervision of and participation in CMC's investigation of the Debtor's accounts receivable, claims data, and payment histories. If called as a witness, I could and would competently testify to the matters stated herein.

4. CMC employs a team of more than thirty (30) attorneys and deploys proprietary data analytics tools including real-time Electronic Data Interchange ("EDI") claim inquiry systems to conduct large-scale forensic audits of healthcare receivables. The analysis described in this Declaration reflects the application of those tools and methodologies to the Debtor's claims portfolio.

## II. CMC'S INVESTIGATION OF THE DEBTOR'S ACCOUNTS RECEIVABLE

8.  Since being retained as Special Counsel, CMC has conducted an extensive audit and reconciliation of the Debtor's accounts receivable, claims data, and payment histories. This investigation has been conducted on an ongoing basis since plan confirmation and remains active.

9.  CMC's work has included the review and analysis of tens of thousands of claims submitted by the Debtor across multiple commercial, Medicare, and Medicaid payers, representing tens of millions of dollars in billed charges.

10. The investigation has included detailed analysis of the following data and records:

- Electronic claim submission data (ANSI X12 837 transactions);

- Payer remittance advice (ANSI X12 835 Electronic Remittance Advice transactions);

- Real-time claim status inquiry and response data (ANSI X12 276/277 transactions);

- Eligibility and benefits verification data (ANSI X12 270/271 transactions);

- Internal accounts receivable ledgers and payment reconciliation records; and

- Payer-specific reimbursement histories, explanation of benefits documents, and fee schedule analyses.

11. Based on this analysis, CMC has identified millions of dollars in potential underpayments, improper denials, and other discrepancies requiring further investigation. The investigation has revealed multiple categories of issues, including: (i) systemic underpayment or denial of laboratory and diagnostic claims; (ii) application of reimbursement methodologies inconsistent with applicable fee schedules and payer contracts; (iii) blanket denial of claims without individualized adjudication; and (iv) claims that remain unpaid or unresolved.

12. Importantly, CMC's work on behalf of the Debtor's estate has not been limited to investigation and analysis. To date, and as a direct result of CMC's post-confirmation

10

recovery efforts, CMC has recovered hundreds of thousands of dollars for the benefit of the Debtor's estate through negotiated resolutions with certain payers. The specific terms of those resolutions are confidential; however, the fact of these recoveries confirms both the validity of the Debtor's underlying claims and the effectiveness of CMC's recovery methodology. Significant additional recovery opportunities have been identified and remain actively under investigation. The requested extension is necessary to allow CMC to pursue those opportunities to their full conclusion for the benefit of the estate and its creditors.

## III. SPECIFIC FINDINGS

13. CMC's investigation to date has identified significant outstanding balances and discrepancies involving multiple major payers, including:

- Blue Cross Blue Shield (Illinois) – Approximately 71,000 claims reviewed, with over $6.5 million identified as outstanding or underpaid;

- United Healthcare – Approximately 32,000 claims reviewed, with over $2.5 million identified as outstanding or underpaid; and

- Aetna – Approximately 26,000 claims reviewed, with over $2.2 million identified as outstanding or underpaid.

14. In addition to the foregoing, material discrepancies have been identified across numerous other payers, including Medicare programs, national commercial carriers, and managed care organizations, many of which reflect similar patterns of underpayment, denial, or inconsistent application of reimbursement methodologies.

15. United Healthcare has filed a proof of claim in this case. However, based on CMC's analysis of the Debtor's claims data and payment histories, there is a substantial basis to believe that

11

United Healthcare may, in fact, owe funds to the Debtor arising from unpaid or underpaid claims. This creates potential rights of setoff, recoupment, or affirmative recovery by the estate that require further analysis before CMC can make a definitive recommendation regarding the appropriate course of action.

16. CMC's investigation has identified a particularly significant pattern of underpayment and denial across multiple Molina Healthcare entities operating in multiple jurisdictions. The Debtor submitted thousands of claims to Molina-affiliated entities, and CMC's analysis reflects reimbursement rates that are facially inconsistent with applicable fee schedules and coverage terms. In certain jurisdictions, Molina reimbursed less than fifteen percent (15%) of billed charges and in some instances less than five percent (5%) for claims that were properly submitted and covered. These patterns appear across multiple Molina-affiliated entities and jurisdictions, which, in my professional opinion, is consistent with centralized, algorithm-driven claim suppression rather than individualized coverage determinations.

17. Despite CMC's repeated efforts to engage Molina Healthcare entities in reconciliation discussions, Molina has declined to participate in a meaningful meet-and-confer process, imposing preconditions that have prevented substantive engagement. This refusal to engage in good faith has directly impeded CMC's ability to complete its investigation without

resorting to formal discovery.

**IV. NEED FOR ADDITIONAL TIME AND FORMAL DISCOVERY**

18. CMC's investigation is active and ongoing. Notwithstanding the substantial work completed to date, the investigation is not yet complete. Additional time is required due to: (i) the volume of claims at issue, spanning dozens of payers and hundreds of thousands of individual claims; (ii) the complexity of the reimbursement frameworks, payer contracts,

and applicable fee schedules for each counterparty; (iii) the absence of claims processing documentation and adjudication data that only formal discovery can compel; and (iv) the refusal of Molina and other counterparties to engage in good-faith reconciliation.

19. In many instances, counterparties have not produced sufficient information to permit complete reconciliation. CMC has been unable to obtain claims processing records, adjudication system documentation, or reimbursement algorithm data from multiple payers despite informal requests. Formal discovery under Federal Rule of Bankruptcy Procedure 2004 is necessary to compel production of this information.

20. CMC is actively preparing Rule 2004 examination requests directed to specific payers and counterparties, including entities that have filed proofs of claim in this case and entities whose adjudication practices reflect the patterns described above. Issuing subpoenas, litigating any objections, receiving productions, and completing the necessary analysis cannot be accomplished before the current March 29, 2026 deadline.

21. Based on the scope of the investigation to date and the issues identified, it is my professional opinion that extending the deadline under 11 U.S.C. § 546(a) is necessary to allow the Debtor and its professionals to complete the investigation, conduct formal discovery, and fully evaluate whether avoidance actions or other causes of action should be commenced for the benefit of the estate and its creditors. Failing to extend the deadline risks permanently forfeiting causes of action that the investigation indicates are real and material.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on March 26, 2026, at Ebensburg, Pennsylvania.

Richard Hersperger
Chief Executive Officer
Crown Medical Collections
100 West High Street
Ebensburg, PA 15931

14